# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

№ 02 Civ. 1108 (RJS)

_____

RONALD G. BOOKMAN,

Plaintiff,

VERSUS

MERRILL LYNCH,

Defendant.

_____

OPINION AND ORDER
May 14, 2009

_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff Ronald G. Bookman brings this action against Defendant Merrill Lynch, alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiff contends that Defendant failed to accommodate his disability, terminated his employment in a discriminatory fashion on the basis of his age and race, created a hostile work environment, and retaliated against him for engaging in conduct that is otherwise protected by these laws.

Before the Court is Defendant's motion for summary judgment as to each of Plaintiff's claims. For the reasons set forth below, the motion is granted in part and denied in part.

## I. BACKGROUND

The facts described below are taken from the parties' Local Rule 56.1 Statements, the affidavits and declarations submitted in connection with the motion, and the exhibits attached thereto. Where only one party's Rule 56.1 Statement is cited, the opposing party does not dispute that fact or has not presented admissible evidence to controvert it.

### A.  Facts

The Court describes the factual circumstances of this case in three parts. First, the Court provides background regarding the mechanics of Defendant's Professional Development Program (the "PDP") for Financial Consultants ("FCs"). Second, the Court discusses the undisputed facts regarding Plaintiff's employment as an FC Trainee in the PDP. Finally, the Court describes the evidence adduced by Plaintiff of discriminatory conduct by Defendant's employees.

### 1.  Overview of the Professional Development Program For Financial Consultants

At the time relevant to Plaintiff's claims, Defendant had a training program for FCs known as the PDP. This program was overseen by Hassan Tabbah, the Resident Vice-President of Defendant's office at the Fifth Avenue Financial Center, and Patrick Donohue, a Sales Manager supervised by Tabbah. (Donohue Aff. ¶¶ 1, 2; Tabbah Aff. ¶¶ 1, 3.)

Employees entering the PDP were known as "FC Trainees." FC Trainees were required to obtain the required state and federal licenses before they were permitted to sell securities and other products to Defendant's customers. (Def.'s 56.1 ¶ 7.) In 1998, FC Trainees were given approximately four months to obtain these licenses. (*Id.*)

Once they were properly licensed, FC Trainees participated in a twenty-four month program during which they were expected to begin to develop clients and generate "production credits." (*Id.* ¶ 8.)[1] Employees in this phase of the program were referred to as "PDP FCs," and the transition from the FC Trainee phase of the program to the PDP FC phase was known as "entering production." (*Id.* ¶¶ 8, 9.) To facilitate that transition, each new PDP FC was granted a "stub" period, during which they were not required to meet Defendant's specific goals for generating business. (*Id.* ¶ 10.) Generally, a PDP FC's stub period was during his or her first month of production, which was usually the fifth month after entering the program as an FC Trainee. (*Id.* ¶ 11.)

Following the stub period, Defendant set production requirements for PDP FCs in three categories: (1) production credits generated, (2) number of financial plans completed, and (3) cumulative assets under management. (*Id.* ¶ 12; *see also* Pl.'s 56.1 ¶ 12.) PDP FCs were assessed each month according to their production in these respective categories. (Def.'s 56.1 ¶ 13.) After eight months in production — including the stub period — PDP FCs were required to have generated 20,000 production credits, completed four financial plans, and accumulated $1.8 million in assets under management. (*Id.* ¶ 14.)

Donohue was responsible for monitoring PDP FCs' progress toward satisfying the requirements of the program. (*Id.* ¶ 17.) Based on their performance, PDP FCs received monthly ratings of "far exceeds requirements," "exceeds requirements," "meets requirements," or "does not meet requirements." (*Id.* ¶ 13.) In order to receive an overall "meets requirements" rating, PDP

---

[1]   The term "production credit" is not defined in the record, and neither party has explained Defendant's method for calculating these credits. However, the Court deems this information immaterial to the resolution of Defendant's motion.

FCs were required to meet all three of the requirements. (*Id.*) If, after five months of being "in production," a PDP FC was not satisfying the requirements in each category, Donohue would meet with the person to provide a warning that the failure to meet the requirements in each of the three categories after eight months would result in his or her termination. (*Id.* ¶ 18.)

At the end of the twenty-four month PDP, FCs were required to have generated 150,000 production credits, completed 25 financial plans, and accumulated $10 million of client assets under management. (*Id.* ¶ 15.) PDP FCs who met those requirements by the end of the twenty-four month period became "full-fledged FCs," whose compensation was based, in large part, on the production credits that they produced each month. (*Id.* ¶ 16.)

2. Plaintiff's Employment at Merrill Lynch

In May 1997, Plaintiff responded to an advertisement in the Wall Street Journal regarding an FC position, and he was granted an interview for the job. (*See* Def.'s 56.1 ¶ 1.) During the interview process, Plaintiff met with both Tabbah and Donohue, and he was ultimately offered the position with a starting salary of $40,000 per year. (*Id.* ¶ 4; Pl.'s Decl. Ex. A, Pl.'s Interrog. Resp. ("Pl.'s Interrog. Resp.") at 1-2.)

i. Plaintiff's FC Trainee Period

Plaintiff is an African American male, and he was approximately fifty years old when he began work as an FC trainee on January 5, 1998. (*See* Compl. at 4; Def.'s 56.1 ¶ 5; Pl.'s Interrog. Resp. at 11.) On January 16, 1998, Plaintiff's mother became seriously ill at her home in Texas. (Pl.'s

Interrog. Resp. at 6.) Plaintiff informed Donohue of the situation and traveled to Texas to be with his mother in the hospital. (Def.'s 56.1 ¶ 20.) From that time until approximately March 14, 1998, when his mother passed away, Plaintiff frequently traveled between New York and Texas. (*Id.* ¶ 21.)

Plaintiff was paid during the time that he missed work while he was with his mother. (Morway Aff. Ex. A, Pl.'s Dec. 22, 2003 Dep. ("Pl.'s Dep.") at 219:8-11.) On February 2, 1998, Plaintiff requested an unpaid leave of absence, which his supervisors declined to grant him. (Pl.'s Interrog. Resp. at 6.) Plaintiff asserts that, during that February 2 conversation, and again on February 9 and 27, 1998, Donohue threatened to terminate him if he did not return to work. (*Id.* at 6-7.)

ii. Plaintiff's PDP FC Period

Although the parties dispute the length of Plaintiff's "stub" period, it is undisputed that Plaintiff's first month of "production" was September 1998. (Pl.'s Dep. at 246:7-10; Def.'s 56.1 ¶ 26.) Plaintiff consistently received "does not meet requirements" performance ratings from the time he entered production until his termination in May 1999. (*See* Def.'s 56.1 ¶ 29.)

Donohue met with Plaintiff to discuss his performance during each of Plaintiff's months in production as a PDP FC. (*Id.* ¶¶ 28-29.) Beginning in February 1999 — Plaintiff's fifth month in production — Donohue began to warn Plaintiff that his failure to obtain "meets requirements" ratings by April 1999 would result in his termination. (*Id.* ¶ 29.)

At the end of Plaintiff's first eight months as a PDP FC, he had obtained the required amount of assets under management and completed the required number of financial plans. (*See id.* ¶ 31.) However, although the parties differ regarding the number of production credits that Plaintiff actually generated, it is undisputed that Plaintiff did not satisfy Defendant's eight-month requirement relating to the generation of production credits. (*Id.*; Pl.'s Decl. ¶ 12.)

Tabbah and Donohue subsequently made a joint decision to terminate Plaintiff's employment (Donohue Aff. ¶ 10; Tabbah Aff. ¶ 6), which occurred on May 5, 1999 (Def.'s 56.1 ¶ 32). A June 1, 1999 "Uniform Termination Notice For Securities Industry Registration," known as a "Form U-5," stated that the reason for Plaintiff's discharge was "Failure to Perform to PDP Standards." (Addendum to Compl.)

### 3. Plaintiff's Evidence of Discrimination

Primarily through his interrogatory responses and a declaration submitted with his opposition to Defendant's motion, Plaintiff has adduced evidence of a series of events and comments that he asserts support an inference of discrimination.[2] The Court discusses this evidence below.

#### i. Segregated Seating in the Workplace

Plaintiff asserts that the work stations for "virtually all the African American financial consultants" were placed in a segregated area of the office. (Pl.'s Decl. ¶ 15; *see also* Pl.'s Interrog. Resp. at 5.) He alleges that the seating was referred to as the "crows nest" or the "segregated section," and it was "openly discussed within the office." (Pl.'s Interrog. Resp. at 5; *see also* Pl.'s Decl. ¶ 15.) When Plaintiff asked Donohue about the seating arrangements, Donohue allegedly stated that "'it's better than sitting at the back of the bus.'" (Pl.'s Interrog. Resp. at 29; *see also id.* at 5.)[3]

#### ii. The Exotic Dancer Incident

In approximately May or June of 1998, Plaintiff asserts that "an exotic dancer began to quickly disrobe and perform a striptease in the near vicinity of [his] desk." (Pl.'s Interrog. Resp. at 31; *see also* Pl.'s Dep. at 324:23-24.) Plaintiff complained to Donohue and Tabbah about the incident, but he claims that he subsequently learned that they approved the event. (Pl.'s Interrog. Resp. at 9.) Plaintiff asserts that "Donohue made it quite clear that he was very unhappy with my complaint about the dancer." (*Id.*)

#### iii. Plaintiff's January 1999 Business Meeting

In January 1999, Plaintiff conducted a meeting of African American business people and ministers in a conference room at Defendant's office. (Pl.'s Interrog. Resp. at 20.) The walls of the conference room in

---

[2]   Reliance on declarations and interrogatory responses is an entirely proper method of opposing a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."); *Danzer v. Norden Sys. Inc.*, 151 F.3d 50, 57 (2d Cir. 1998).

[3]   Throughout this decision, the Court uses internal quotation marks to indicate instances in which Plaintiff attributes an exact quote to the speaker in question.

which the meeting was held were made of glass, and other employees were able to observe the meeting as they passed by the room. (*Id.*)

Plaintiff contends that, as the meeting began, all of the participants noted "that many of the same employees were repeatedly passing by gawking, gesturing, giggling and merely acting in a rude manner as if they were viewing animals in a zoo. . . . The employees were acting as if they'd never seen more than one African American in a single setting before." (*Id.*) After the meeting, Plaintiff reported the incident to Donohue, who replied "'well, what's the problem?'" (*Id.*; *see also* Pl.'s Decl. ¶¶ 41-42.)

iv. Defendant's Denial of Plaintiff's Business Proposals

Plaintiff argues that he was unable to meet the requirements of the PDP FC program because Defendant's employees discriminated against him by failing to support, and sometimes affirmatively hindering, his efforts to generate production credits. (*See* Pl.'s Decl. ¶¶ 13, 49.)

a. The African Methodist Episcopal Church

First, between November 1998 and March 1999, Plaintiff developed a business relationship with the African Methodist Episcopal Church (the "AME"). (Pl.'s Interrog. Resp. at 18.) Plaintiff alleges that the AME was interested in pursuing several mortgage financing opportunities. (*Id.*)

In February 1999, on behalf of the AME, Plaintiff submitted an application for a $1.2 million mortgage to Defendant's real estate lending group. (*Id.* at 19.) Plaintiff was informed by a Merrill Lynch Mortgage and Credit Specialist "that the underwriters might not accept processing of church mortgage loans," but that "it would dramatically assist the process if . . . Tabbah were to lobby the effort." (*Id.*)

On February 3, 1999, Plaintiff sent a letter to Tabbah regarding the pending application. (Pl.'s Decl. Ex. B.) The letter stated that

> I recently submitted a commercial mortgage refinance application for about $1.2 million received from an African Methodist Church in Oakland, California. I was informed by Mr. David Gray of our Mortgage Services Division that [Merrill Lynch] does not finance "not for profit" or "non-profit" institutions regardless of their financial status or ability to service their debt.

(*Id.*) The letter went on to request Tabbah's "input and assistance on this issue," and noted that "[t]he mortgage refinance business especially from my black church client potentials constitute an enormous source of production credits and revenues for me this year." (*Id.*) In response to Plaintiff's request, Tabbah told Plaintiff that he was "not interested" in helping him. (Pl.'s Decl. ¶ 22; *see also* Pl.'s Interrog. Resp. at 19.)

b. Prime Time Radio

Prime Time Radio is an "African American owned and managed firm located in Tallahassee, Florida," which "was an experienced holder and manager of urban radio station properties targeting African Americans." (Pl.'s Interrog. Resp. at 19.) In December 1998, Plaintiff submitted a $17

5

million loan application to Merrill Lynch's Business Financial Services Department on behalf of Prime Time Radio. (*Id.*) Plaintiff also indicated that he believed that Prime Time Radio would be "a good candidate to take public." (*Id.*)

When Plaintiff submitted the application, he was advised that he would need Tabbah's support. (*See id.* at 20; Pl.'s Decl. ¶ 24.) However, "Tabbah again refused to give [Plaintiff] any assistance with this project." (Pl.'s Decl. ¶ 24; Pl.'s Interrog. Resp. at 20.)

c.   Prince Alwaleed Bin Talal

On January 11, 1999, Plaintiff received a facsimile from Dr. Khalid Abdullah Tariq Al-Mansour, a legal adviser to Prince Alwaleed Bin Talal of Saudi Arabia. (Pl.'s Interrog. Resp. at 22.) In the transmission, Dr. Al-Mansour stated, on behalf of Prince Alwaleed Bin Talal, that he "would like to know Merrill Lynch's views on the topic of strategic alliances, especially in Africa." (Pl.'s Decl. Ex. D.) However, both Donohue and Tabbah stated that "there was no interest at Merrill Lynch in forming any alliance with the Prince." (Pl.'s Interrog. Resp. at 22.)

d.   The Fifth African American Summit

In January 1999, Plaintiff was invited to attend the Fifth African American Summit, which was to be held in Ghana from May 15 to May 22, 1999. (*Id.* at 21.) In an April 23, 1999 letter to Tom Rasmussen, an Administrative Manager at Merrill Lynch, Plaintiff stated that he was selected to speak at the Summit "principally due to [his] 10 year business background in international markets and having successfully conducted business in

both Africa and Europe." (*See* Pl.'s Decl. Ex. C.)

When Plaintiff sought permission to attend the Summit, Tabbah called him to his office "in a highly hostile state, 'slammed his fist' to his desk and stated forcibly, 'I forbid you to attend this event.'" (Pl.'s Interrog. Resp. at 22.) Tabbah also "shouted" that Plaintiff "'was a domestic retail Financial Consultant and there was no opportunity for [Plaintiff] or Merrill Lynch in attending such events,'" and that it would be "'a colossal waste of time.'" (*Id.*)

e.   Shorter College

In February 1999, Shorter College opened an account with Plaintiff with an initial deposit of approximately $150,000. (Pl.'s Interrog. Resp. at 19.) Plaintiff contends that the client was "looking for a senior debt facility of $500,000 . . . ." (*Id.*)

On March 8, 1999, Plaintiff requested assistance from the Commercial Mortgage Group of Merrill Lynch's Business Financial Services Department. (*Id.*) He was advised that he would need Tabbah to endorse the project. (*Id.*) However, Tabbah "refused" to do so and the loan application "lost traction." (Pl.'s Decl. ¶ 23; Pl.'s Interrog. Resp. at 19.)

f.   Account Distributions

Plaintiff challenges the manner in which Defendant redistributed the client accounts of departing FCs to PDP FCs. (Pl.'s Interrog. Resp. at 10.) According to Defendant's policy, PDP FCs were only eligible to receive these distributions if they had been in the program for four months or more, and if they had received ratings of "far exceeds

6

requirements" or "exceeds requirements." (Morway Reply Aff. Ex. B, Tabbah's Mar. 23, 2004 Dep. at 175:17-21.)

Plaintiff argues that Tabbah exercised unfettered discretion over the account distributions, and that "lucrative and active client accounts were secretly and selectively distributed to young white PDP participants" between June 1998 and May 1999. (Pl.'s Interrog. Resp. at 10.) Plaintiff alleges that "[q]uite by chance," he "learned that the account of a family acquaintance had been distributed to Alexander Nephew, a young White FC who was not meeting his goals . . . ." (Pl.'s Decl. ¶ 48.) He contends that "the account was distributed to Nephew, and then re-assigned to [Plaintiff] at the customer's insistence." (*Id.*; *see also* Pl.'s Interrog. Resp. at 19.)

v. Alleged Comments by Defendant's Employees

Lastly, Plaintiff asserts that a series of discriminatory comments were made by Tabbah, Donohue, and Plaintiff's co-workers during the course of his employment. Donohue and Tabbah deny making these comments. (*See* Def.'s Reply at 21 n.7.) Although the Court does not — and, procedurally speaking, could not — make findings of fact at this stage of the litigation, Plaintiff's allegations and evidence of these remarks are relevant to the Court's analysis of Defendant's motion for summary judgment.

a. Alleged Comments by Tabbah

Plaintiff asserts that Tabbah "made consistent and ongoing disparaging racist comments against [his] class of clients" by referring to "'the worth of Africans as investors, etc.'" (Pl.'s Interrog. Resp. at 20.) Plaintiff points to two specific allegedly discriminatory comments made by Tabbah.

First, in January 1999, during a discussion regarding Plaintiff's invitation to participate in the Fifth African American Summit in Ghana, Africa, Tabbah allegedly "stated that [Nigerians] were all a bunch of 'con artists' and that Merrill Lynch didn't want anything to do with them." (Pl.'s Decl. ¶ 32.) Subsequently, when Tabbah refused to grant Plaintiff permission to attend the conference, he stated "'that these people were no good as investors and that [Plaintiff] should be concentrating on developing more white clients.'" (Pl.'s Interrog. Resp. at 22; *see also* Pl.'s Decl. ¶ 32.)

Second, although Plaintiff fails to provide specific dates, he alleges that "Tabbah told me, on more than one occasion, that I was wasting my time courting Black investors, and he point blank told me that I should be devoting my efforts toward obtaining White accounts." (Pl.'s Decl. ¶ 19.)

b. Alleged Comments by Donohue

Plaintiff alleges that Donohue made several discriminatory comments during the course of Plaintiff's employment. First, Plaintiff asserts that, on or about January 5, 1998, when he asked Donohue about the allegedly segregated seating arrangements at the office, Donohue stated that "'it's better than sitting at the back of the bus.'" (Pl.'s Interrog. Resp. at 29.) Second, Plaintiff alleges that, in "early 1998," Donohue "pointed to what he referred to as his 'power zone,' i.e., the desks of his favored Financial Consultants that ringed his work area, [and] told [Plaintiff] that the future of the office lay

with young White brokers."  (Pl.'s Decl. ¶ 16.)

Third, in July 1998, during a conversation between Donohue and Plaintiff regarding James Byrd, an African American man who was chained to a pickup truck and dragged to death in Jasper, Texas, Plaintiff alleges that Donohue asked him, "'you don't think he got what was coming to him, do you?'"  (Pl.'s Interrog. Resp. at 13; *see also id.* at 32, 46.)

Fourth, on January 23, 1999, a facsimile was sent to Plaintiff at work by a man from Ghana named Kwame Pianim.  (*Id.* at 23.) When Donohue saw the communication, he allegedly called Plaintiff to his office, asked if Plaintiff had received the communication from Africa, and stated that "'[y]ou know, Merrill Lynch has had a lot of problems with Nigerians and we don't want anything to do with Africa.   They are a bunch of con artists.'"  (*Id.*)

Finally, on May 4, 1999, the day before Plaintiff was terminated, Plaintiff asked Donohue why, instead of being terminated, he was not being demoted to a more junior position outside the PDP.  (*Id.* at 28.) Plaintiff alleges that Donohue stated: "'first of all, you could not carry the briefcase (in selling techniques) of any of the young guys and girls we have here.   And as it related [to] Mr. Cooperman (a young white FC with Mr. Donohue's selling group), you should not even be in the same room with him.'"  (*Id.*) Plaintiff also alleges that Donohue told him "'that [he] could not carry Cooperman's jock shorts.'"  (*Id.* at 46).

c.  Alleged Comments By Other Employees of Defendant

Additionally, Plaintiff points to two other comments that he alleges were made by his co-workers.  First, at some unspecified point during Plaintiff's employment, Plaintiff asserts that a white male named "Healey" interrupted a conversation that he was having with another co-worker and "stated loudly, 'Bookman, get your ass to the meeting.'  . . . 'get your black ass to the meeting.'"  (*Id.* at 33; *see also id.* at 14.)

Second, Plaintiff alleges that, during a meeting of all the FCs in the program in late 1998 or early 1999 that was led by a white male named "Disanza," he was "viciously berated" and called an "'idiot'" based on his suggestion that Morgan Stanley stock was a good investment.  (Pl.'s Decl. ¶ 18; Pl.'s Interrog. Resp. at 15.)

B.  Procedural History

After filing a complaint with the Equal Employment Opportunity Commission, Plaintiff received a "Notice of Right to Sue" letter on November 30, 2001.  On February 11, 2002, he commenced this action as a *pro se* litigant, and the case was assigned to the Honorable William H. Pauley III, District Judge.  (Doc. No. 1.)  On July 2, 2002, Defendant filed its Answer.  (Doc. No. 6.)

On August 20, 2002, the Honorable James C. Francis, Magistrate Judge, granted Plaintiff's application for an appointment of counsel and stayed discovery in this matter pending the appearance of volunteer counsel. (Doc. No. 12.)  On September 16, 2003, in light of the fact that a year had passed without an attorney volunteering to represent Plaintiff

on a *pro bono* basis, Judge Francis lifted the discovery stay and directed that all discovery be completed by February 27, 2004. (Doc. No. 16.)

Following the completion of discovery, Defendant filed a motion for summary judgment on May 12, 2004. (Doc. No. 58.) Due to medical problems, Plaintiff received numerous extensions of the deadline by which he was to submit his opposition to the motion. The case was eventually reassigned to the Honorable Kenneth M. Karas, District Judge, on September 14, 2004. (Doc. No. 71.)

On March 28, 2005, counsel for Plaintiff appeared in this action for the purpose of litigating the pending motion. (Doc. No. 76.) However, on June 9, 2005, Judge Karas suspended the briefing schedule on Defendant's motion for summary judgment in order to permit the parties to pursue settlement discussions. (Doc. No. 80.) On December 15, 2005, Judge Karas entered a conditional order of dismissal, which provided that either party could reopen the case if a settlement was not consummated within sixty days. (Doc. No. 83.) On February 15, 2006, Judge Karas extended that order for an additional ninety days. (Doc. No. 84.) However, by letter dated May 3, 2006, Plaintiff's counsel informed Judge Karas that the parties had been unable to resolve the action. (Doc. No. 85.)

On July 31, 2006, Plaintiff responded in opposition to Defendant's May 12, 2004 motion for summary judgment. ("Pl.'s Mem." (Doc. No. 88).) Defendant filed its reply papers on October 13, 2006. ("Def.'s Reply" (Doc. No. 94).) This case was reassigned to the undersigned on September 4, 2007, and the Court conducted oral argument on the pending motion on December 7, 2007.

## II. LEGAL STANDARD

On a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008).

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

> Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.

*Global Aerospace, Inc. v. Hartford Fire Ins. Co.*, No. 06 Civ. 7104 (LAK), 2009 WL 89122, at *5 (S.D.N.Y. Jan. 13, 2009).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. . . . Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotations omitted).

## III. DISCUSSION

Plaintiff's Complaint, which he filed as a *pro se* litigant, contains employment discrimination claims under the ADA, Title VII, and the ADEA. Plaintiff brings four types of discrimination claims: (1) failure to promote, (2) retaliation, (3) discriminatory termination, and (4) hostile work environment. (Compl. at 3.)

After obtaining counsel, Plaintiff has clarified that, with respect to his claims under Title VII and the ADEA, "[t]he gravamen" of his case "is that the prejudicial attitude of [his supervisors] toward the value of Black investors and [Plaintiff's] efforts to market Merrill's services and financial products to

the Black community prevented [him] from satisfying Merrill's objective requirements" for PDP FCs. (Pl.'s Decl. ¶ 49.)

For the reasons set forth below, the Court concludes that Plaintiff has abandoned his claims under the ADA, as well as his claims for failure to promote and retaliation under Title VII and the ADEA. However, Plaintiff has adduced sufficient evidence to survive summary judgment on his discriminatory termination claims under Title VII and the ADEA, and his hostile work environment claim under Title VII. Accordingly, Defendant's motion for summary judgment is granted in part and denied in part.

### A. Plaintiff's Abandoned Claims

In Plaintiff's brief in opposition to Defendant's motion, Plaintiff failed to address Defendant's arguments regarding his ADA claims, as well as his claims for retaliation and failure to promote under the ADEA and Title VII. Moreover, at oral argument regarding Defendant's motion, Plaintiff's counsel acknowledged that "[t]here is no ADA claim here . . . ," and that he had "not analyzed this case from the retaliation point of view." (Tr. at 35:2, 16-17.)[4] Rather, in the

_____

[4]   In Plaintiff's interrogatory responses, he asserted that Defendant's notation in Plaintiff's June 1, 1999 U-5 Form that he was terminated for "failure to perform to PDP standards" constituted retaliation for his prior complaints about workplace discrimination. (Pl.'s Interrog. Resp. at 29.) Plaintiff abandoned that argument in his opposition to Defendant's motion for summary judgment, and instead argued that the U-5 Form was evidence of disparate treatment. (*See* Pl.'s Mem. at 14.) However, despite Plaintiff's conclusory assertion that it is "undisputed" that Defendant had a policy of permitting PDP FCs to resign voluntarily rather than terminating them (Pl.'s Decl. ¶ 54), he has adduced no evidence of such a policy. Indeed,

view of Plaintiff's counsel, "this case is purely a discrimination case . . . ." (*Id.* at 35:17-18.)

Plaintiff's failure to oppose Defendant's motion on these grounds constitutes an abandonment of the claims for which he chose to offer neither legal argument nor evidentiary support. *See, e.g.*, *Bellegar de Dussuau v. Blockbuster, Inc.*, No. 03 Civ. 6614 (WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (finding pregnancy discrimination claim abandoned by virtue of the plaintiff's failure to address it in opposition to defendant's summary judgment motion on the claim); *Arias v. NASDAQ/AMEX Mkt. Group*, No. 00 Civ. 9827 (MBM), 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003); *Lauro v. City of New York*, 39 F. Supp. 2d 351, 366 n.13 (S.D.N.Y. 1999); *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998); *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998); *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, No. 92 Civ. 1735 (LAP), 1998 WL 118174, at *28 (S.D.N.Y. Mar. 16, 1998).[5] Accordingly,

_____

Defendant is obligated by law to truthfully report in a U-5 Form the reason for an employee's departure. (*See* Def.'s Mem. at 15.) Accordingly, the U-5 Form by itself provides no evidence of discriminatory animus, whether the claim is one of disparate treatment or retaliation.

[5] Plaintiff has likewise failed to respond to Defendant's arguments that: (1) there is no evidence that Plaintiff was denied an adjustment to his PDP training schedule; and (2) there is no evidence that Plaintiff was treated differently than other employees with respect to the timing of his Series 7 exam. (Def.'s Mem. at 12, 14.) Accordingly, to the extent Plaintiff initially sought to bring claims relating to these issues, those claims are deemed abandoned and are therefore dismissed.

Plaintiff's ADA claims, as well as his failure to promote and retaliation claims under both the ADEA and Title VII, are dismissed.

## B. Plaintiff's Discriminatory Termination Claims

With respect to Plaintiff's claims that he was unlawfully terminated for discriminatory reasons, he argues that he has produced both direct and circumstantial evidence of discrimination, and that "[a] reasonable juror could conclude that plaintiff's managers, acting on a race or age bias, or both, intentionally suppressed plaintiff's production, resulting in his termination for failing to meet defendant's production quotas." (Pl.'s Mem. at 6; *see also id.* at 11-12.)

In light of Plaintiff's argument that there is evidence directly reflecting an attitude of unlawful discrimination, the Court analyzes the evidence in the record under the "mixed motive" framework articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1998). For the reasons set forth below, the Court concludes that summary judgment is inappropriate because of disputed issues of material fact regarding the "ultimate issue": whether a fact finder could reasonably conclude that Defendant unlawfully discriminated against him. *See Stratton v. Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997).

### 1. Applicable Law

#### i. Burden Shifting in Employment Discrimination Cases

"A court's analysis of an unlawful employment discrimination allegation

proceeds either according to the familiar burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973), or under the so-called mixed motive theory" articulated in *Price Waterhouse v. Hopkins*, 490 U.S. at 244-45. *Knight v. New York City Housing Auth.*, No. 03 Civ. 2746 (DAB), 2007 WL 313435, at *6 (S.D.N.Y. Feb. 2, 2007).

As succinctly stated by the Second Circuit, under the *McDonnell Douglas* framework,

> [A] plaintiff first bears the minimal burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

*McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006).

In *Price Waterhouse v. Hopkins*, the Supreme Court articulated a burden-shifting framework to be applied in cases where the plaintiff comes forth with evidence that a discriminatory factor played a "motivating part" in an adverse employment action. *See* 490 U.S. at 244-45. Although *Price Waterhouse* involved a Title VII claim, the framework also applies to claims under the ADEA. *See, e.g., Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 161-62 (2d Cir. 2001); *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991).

In a mixed-motive case, "[i]f the [p]laintiff establishes that a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision, the burden shifts to the employer . . . ." *Knight*, 2007 WL 313435, at *6; *see also Osborne v. Literacy Partners, Inc.*, No. 04 Civ. 6652 (DAB), 2007 WL 2298354, at *7 (S.D.N.Y. Aug. 9, 2007). "However, '[t]o warrant a mixed motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment.'" *Ahmed v. Heartland Brewery L.L.C.*, No. 05 Civ. 2652 (PKC), 2007 WL 2125651, at *4 (S.D.N.Y. July 25, 2007) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 61 (2d Cir. 1997)). "Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia*, policy documents and evidence of statements or actions by decisionmakers 'that may be viewed as *directly reflecting* the alleged discriminatory attitude.'" *Raskin*, 125 F.3d at 60-61 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997) (emphasis in original).

Where there is sufficient evidence of discrimination to justify a *Price Waterhouse* burden shift, "the employer bears the burden of proving that it would have made the same decision even had there been no such animus." *Jalal v. Columbia Univ.*, 4 F. Supp. 2d 224, 233 (S.D.N.Y. 1998). Importantly, however, "'[p]roving 'that the same decision would have been justified . . . is not the same as proving that the same decision would have been made.'" *Price Waterhouse*, 490 U.S. at 252 (quoting *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 416 (1979)).

"An employer may not, in other words, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." Nor may the employer "meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason."

*Scully v. Summers*, No. 95 Civ. 9091 (PKL), 2000 WL 1234588, at *15 (S.D.N.Y. Aug. 30, 2000) (quoting *Price Waterhouse*, 439 U.S. at 252).

However, regardless of whether the *Price Waterhouse* or *McDonnell Douglas* framework is applied, the ultimate issue is: "Whether the plaintiff has presented evidence from which a rational finder of fact could conclude that the defendant discriminated against [him] illegally." *Jalal*, 4 F. Supp. 2d at 234.

ii. Verbal Comments and "Stray" Remarks

"[A]ll comments pertaining to a protected class are not equally probative of discrimination." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007). "Although evidence of one stray comment by itself is usually not sufficient proof to show . . . discrimination, that stray comment may 'bear a more ominous significance' when considered within the totality of the evidence." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)). Specifically, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they

prove that the action was motivated by discrimination." *Tomassi*, 478 F.3d at 115.

In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative "stray remark," a court should consider the following factors: (1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process.

*Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 363 (S.D.N.Y. 2007) (citing *Minton v. Lenox Hill Hosp.*, 160 F. Supp. 2d 687, 694 (S.D.N.Y. 2001)); *see also Quinby v. WestLB AG*, No. 04 Civ. 7406 (WHP), 2007 WL 3047111, at *1 (S.D.N.Y. Oct. 18, 2007).

2. Analysis

Applying the *Price Waterhouse* "mixed motive" framework, the Court concludes that there are disputed issues of material fact with respect to whether: (1) Plaintiff has adduced sufficient evidence of discrimination to permit a jury to conclude that the burden of proof should shift to Defendant, and (2) Defendant has demonstrated by a preponderance of the evidence that Plaintiff would have been terminated regardless of the impact of the allegedly discriminatory motives displayed by Plaintiff's supervisors. Accordingly, Defendant's motion for summary judgment is denied as to Plaintiff's discriminatory

termination claims under both Title VII and the ADEA.

Under *Price Waterhouse*, "direct" evidence of discrimination includes "'actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173 (2d Cir. 2006) (quoting *Raskin*, 125 F.3d at 60-61)).[6] "The *Price Waterhouse* Court made clear that the burden-shifting threshold a plaintiff must cross is proof that the forbidden animus was at least one of the 'motivating' factors in the employment decision; he or she need not show that it was the sole reason, or the 'true' reason, or the 'principal' reason." *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 180 (2d Cir. 1992) (internal citations omitted).

Tabbah and Donohue were employed by Defendant, supervised Plaintiff, and

---

[6]   In this context, the word "direct" is better understood to indicate that a remark or action directly reflects a discriminatory attitude. *See Sista*, 445 F.3d at 173; *Cartagena v. Ogden Servs. Corp.*, 995 F. Supp. 459, 462 (S.D.N.Y. 1998). This is because the phrase "'[d]irect evidence' of discrimination is something of a misnomer, in that any evidence short of a bald statement by the decisionmaker to the effect that they are firing an employee for an impermissible reason requires some inferential step to support a finding of discriminatory motive." *Cartagena*, 995 F. Supp. at 462. However, "[i]n a mixed-motive case, the term 'direct evidence' is used 'to distinguish direct evidence from the kind of evidence which makes out a *McDonnell Douglas prima facie* case — *i.e.*, evidence from which an inference of discrimination arises only because it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection, and which inference is therefore immediately dispelled once the employer has produced evidence of a nondiscriminatory reason." *Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762, 768 (S.D.N.Y. 2002) (quoting *Cartagena*, 995 F. Supp. at 462)).

acknowledge that they jointly made the decision to terminate him (Donohue Aff. ¶ 10; Tabbah Aff. ¶ 6). Although the parties dispute whether the allegedly racist and age-related remarks were actually made, Plaintiff's evidence of these comments, if credited, is sufficiently linked to Plaintiff's termination to permit a finder of fact to conclude that Plaintiff is entitled to a *Price Waterhouse* burden shift.

In *Jalal v. Columbia University*, the court noted that the plaintiff had adduced both "direct" and indirect evidence that she was unlawfully discriminated against on the basis of her national origin and religion in connection with the decision of a tenure committee at Columbia University. 4 F. Supp. 2d at 227, 234. In assessing the evidence of allegedly discriminatory comments, the court offered two general principles that provide useful guidance on the issue of "[w]hether a decisionmaker's comment supports an inference of bias . . . ." *Id.* at 235. First, a comment supports a rational inference of bias where "the speaker is preoccupied with a [protected] classification in a setting where a focus on other issues would ordinarily be expected." *Id.* at 235. Second, "a statement can reveal a speaker's prejudice if it (1) makes a reference to a [protected] class *and* (2) provides some indication that membership in such a class is disapproved of." *Id.* at 236 (emphasis in original). The record in this case contains evidence of both types of comments.

The alleged comment made by Donohue on May 4, 1999 fit roughly within the first category identified in *Jalal*. In response to a question from Plaintiff regarding why, as an alternative to being terminated, he was not being demoted out of the PDP, Donohue is

14

alleged to have told Plaintiff that he "'could not carry the briefcase (in selling techniques) of any of the *young* guys and girls'" in the PDP. (Pl.'s Interrog. Resp. at 28 (emphasis added).) This remark was allegedly made on the day before Plaintiff was terminated, it related to his termination, and it was made by a person who participated in making the firing decision. The Court cannot conclude as a matter of law that this alleged comment was merely a "stray remark."

Donohue's alleged response to Plaintiff's question regarding the workplace seating arrangement — "'it's better than sitting at the back of the bus'" (Pl.'s Interrog. Resp. at 29) — likewise suggests a preoccupation with race in a context in which a more fact-based explanation would have sufficed. Indeed, Defendant's proffered non-discriminatory explanation for the seating arrangement — that "no other seats were available" (Def.'s Mem. at 18) — is precisely the sort of race-neutral and non-discriminatory response that Donohue allegedly failed to provide to Plaintiff. A similarly permissible inference of racially driven animus is apparent on the face of Donohue's alleged question to Plaintiff regarding whether James Byrd "'got what was coming to him . . . .'" (Pl.'s Interrog. Resp. at 13.)

Plaintiff has also adduced evidence of several comments that fall into the second category discussed in *Jalal*. For example, Donohue's alleged statement in early 1998 that "the future of the office lay with young White brokers" referenced two protected classes — age and race — and supports an inference that non-membership in those classes was disfavored by Donohue in terms of PDP FCs' chances of success in the program. (Pl.'s Decl. ¶ 16.) Similar

inferences are available with respect to: (1) Tabbah's alleged statements, which Plaintiff contends were reiterated on more than one occasion, that Plaintiff was "wasting [his] time courting Black investors" and "should be devoting [his] efforts toward obtaining White accounts" (Pl.'s Decl. ¶ 19); and (2) Tabbah's alleged comment in reference to the potential attendees of the Fifth African American Summit that "'that these people were no good as investors and that [Plaintiff] should be concentrating on developing more white clients.'" (Pl.'s Interrog. Resp. at 22.)

Finally, in connection with a discussion of the Fifth African American Summit, Plaintiff alleges that a supervisor also stated that Nigerians are "all a bunch of 'con artists' and that Merrill Lynch didn't want anything to do with them." (Pl.'s Decl. ¶ 32.) In its Reply Brief, Defendant asserts that this comment "does not relate to race, but only to national origin — and not Plaintiff's national origin." (Def.'s Reply at 13 n.9.) The Court cannot resolve this issue on a motion for summary judgment. The alleged comment regarding *Nigerians* was allegedly made by Tabbah in the context of a discussion regarding a gathering of *African Americans* to be held in *Ghana*. The comment implicated a Title VII class — either race or national origin — and expressed plain disapproval for that group by referring to them as "con artists." Although the Court is unable to reach a conclusion from the face of the remark whether the speaker intended to implicate race or national origin, the comment is probative, to some extent, of discriminatory bias.

In addressing the evidence of these comments, Defendant overemphasizes the fact that Donohue and Tabbah both hired and fired Plaintiff, and exaggerates the force of

the "same actor" inference. (*See* Def.'s Mem. at 10.) "The 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand." *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999) (citing, *inter alia*, *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)); *see also Braunstein v. Barber*, No. 06 Civ. 5978 (CS) (GAY), 2009 WL 849589, at *9 (S.D.N.Y. Mar. 30, 2009). Simply put, in light of the evidence in the record of discriminatory comments by Donohue and Tabbah, the application of the "same actor" inference at this stage would improperly usurp the role of the fact finder.[7]

Moreover, that Donohue and Tabbah deny making these comments is of no moment in the context of a motion for summary judgment. "If said, a reasonable jury could believe that these remarks 'directly reflect[] the alleged discriminatory attitude.'" *Cartagena*, 995 F. Supp. at 463 (quoting *Raskin*, 125 F.3d at 160-61); *see also Ames*, 193 F. Supp. 2d at 768 (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997)). Based on this evidence, a reasonable juror could conclude that Plaintiff

has established "at the least, a 'thick cloud of smoke' supporting his claim of discriminatory treatment." *Silver*, 490 F. Supp. 2d at 365 (quoting *Raskin*, 125 F.3d at 61); *see also Ames*, 193 F. Supp. 2d at 768 ("Assuming the truth of [the] plaintiff's testimony (as, for purposes of this motion, the court must), . . . repeated statements [by the plaintiff's supervisors] undeniably reflect a discriminatory attitude on the part of the decisionmaker."). Therefore, based on the evidence of these comments by Plaintiff's supervisors, there are — at a minimum — disputed issues of material fact as to whether Plaintiff would be entitled to a shift of the burden of proof under *Price Waterhouse*.[8]

Next, the Court must consider whether, if the burden were to shift to Defendant under *Price Waterhouse*, Defendant has nevertheless proven "it would have made the same decision even had there been no such animus." *Jalal*, 4 F. Supp. 2d at 233. Defendant argues that Plaintiff was terminated because he failed to obtain sufficient production credits to meet the requirements of the PDP. (Def.'s 56.1 ¶¶ 31-32; *see also* Def.'s Mem. at 9.) Plaintiff concedes that he did not satisfy this requirement. (Pl.'s Dep. at 246:5-20.) However, Plaintiff argues that Defendant's

---

[7]    For example, although the Second Circuit applied the "same actor" inference in *Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2001), "[the] plaintiff ha[d] failed to offer *any* evidence that he was subjected to *any* age-related comments or criticisms on the job." *Id.* at 91 (emphasis added). Here, by contrast, Plaintiff has adduced evidence that he was subjected to both age- and race-related comments *by his supervisors*. Therefore, because there are factual disputes regarding these comments, the Court cannot resolve the applicability of the "same actor" inference in the context of a motion for summary judgment.

[8]    The Court notes that, although there is more evidence in the record of race-related comments by Plaintiff's supervisors than there is of age-related remarks, Plaintiff's claim for discriminatory termination under the ADEA need not be dismissed based solely on this relative imbalance. *See Rose*, 257 F.3d at 162 (holding that two comments by the plaintiff's supervisor that he would replace her with someone "younger and cheaper" — one in February 1994 and another at an unspecified time during the 1993-1994 academic year — constituted direct evidence of discrimination in connection with the plaintiff's July 1994 termination).

proffered reason for his termination "does not provide any explanation for why plaintiff's managers blocked his efforts to meet his quotas by soliciting business from the African American community." (Pl.'s Mem. at 13.)

In its Reply Memorandum, Defendant seeks to address these arguments from the perspective of the third step of the *McDonell Douglas* framework, in which it is *Plaintiff's burden* to prove that the employer's proffered reason was a pretext for discrimination. *See McPherson*, 457 F.3d at 215. However, "[p]roducing direct evidence of discrimination does have its reward . . . . [O]nce the plaintiff proffers such evidence, the *burden of persuasion not only shifts to the defendant but it remains there*." *Tappe v. Alliance Capital Mgmt., L.P.*, 198 F. Supp. 2d 368, 373-74 (S.D.N.Y. 2001) (emphasis added). Thus, for the purposes of this analysis, the burden of proof is on Defendant to demonstrate that Plaintiff would have been terminated notwithstanding the evidence that discrimination was a motivating factor in the decision. *See Silver*, 490 F. Supp. 2d at 365 (denying summary judgment based on mixed-motive analysis where the defendants had "not shown that a reasonable jury could *only* find that [the] defendants would have made the same decision regardless of [the plaintiff's] age" (emphasis added)). However, Defendant has not addressed this aspect of the *Price Waterhouse* analysis, much less demonstrated that it is entitled to judgment as a matter of law based on the undisputed facts in the record.

With respect to Plaintiff's argument that his supervisors "suppressed" his business development efforts, the Court is mindful that "the antidiscrimination statutes do not grant the federal courts a 'roving commission to

review business judgments.'" *LaLanne v. Begin Managed Programs*, No. 04 Civ. 9076 (NRB), 2007 WL 2154190, at *3 (S.D.N.Y. July 24, 2007) (quoting *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 106 (2d Cir. 1969)). Moreover, Plaintiff's examples of instances in which his supervisors "suppressed" his production are not, by themselves, particularly probative of discriminatory intent.[9] However, granting Plaintiff the inferences to which he is entitled, the evidence of age- and race-related comments by Tabbah and Donohue is sufficient to preclude summary judgment.

Indeed, Plaintiff has adduced evidence that some of his supervisors' comments were directly related to his proposed business projects, such as the Fifth African American Summit. (Pl.'s Interrog. Resp. at 22; *see also* Pl.'s Decl. ¶¶ 32, 33.) Plaintiff contends that he was told by Donohue that "the future of the office lay with young White brokers." (Pl.'s Decl. ¶ 16.) He further asserts that he was

---

[9]   The Court notes that the "cumulative effect" of allegedly discriminatory acts cannot be relied on by a plaintiff "to establish that [he] suffered an adverse employment action for purposes of a disparate treatment claim." *Dauer v. Verizon Commc'ns Inc.*, No. 03 Civ. 05047 (PGG), 2009 WL 186199, at *3 (S.D.N.Y. Jan. 26, 2009); *Figueroa v. New York City Health & Hosp. Corp.*, 500 F. Supp. 2d 224, 230 (S.D.N.Y. 2007) (finding no authority "for the proposition that [courts] are to consider the cumulative effect of individually alleged adverse employment actions when evaluating an intentional discrimination claim"). However, Plaintiff has not characterized the alleged instances in which his supervisors "suppressed" his business development efforts — either cumulatively or in isolation — as adverse employment actions. Rather, Plaintiff's theory of this case is that Defendant intentionally hindered his ability to meet the goals of the PDP FC program, which provided a pretextual explanation for his otherwise discriminatory termination.

instructed to stop "wasting [his] time courting Black investors," and that he "should be devoting [his] efforts toward obtaining White accounts." (*Id.* ¶ 19.) Based on this evidence, a reasonable fact finder could reject Defendant's argument that Plaintiff was terminated solely because of his failure to meet the goals set for PDP FCs.

In conclusion, there are disputed issues of material fact as to whether Defendant's proffered "legitimate reason" for Plaintiff's termination, "standing alone, would have induced it to make the same decision." *Scully*, 2000 WL 1234588, at *15. More generally, there are disputed factual issues with respect to whether "the evidence 'support[s] a reasonable inference that prohibited discrimination occurred.'" *John v. Dep't of Info. Tech. & Telecomms.*, No. 06 Civ. 13119 (PAC), 2008 WL 4694596, at *4 (S.D.N.Y. Oct. 23, 2008) (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000)).[10]   Therefore, summary judgment is inappropriate because (1) there are factual disputes regarding the existence of evidence of discrimination that, once resolved, may permit Plaintiff to shift the burden of proof to Defendant under *Price Waterhouse*, and (2) there are disputed issues of fact regarding the reasons for which

---

[10]   In light of the nature of the evidence of discrimination in the record, the Court has analyzed the record under the mixed-motive framework of *Price Waterhouse*. However, the same result would follow from the application of the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Jalal*, 4 F. Supp. 2d at 234. Simply put, regardless of whether the burden of proof ultimately falls on Defendant under *Price Waterhouse*, or remains with Plaintiff under *McDonnell Douglas*, disputed issues of fact preclude the resolution of this issue in a motion for summary judgment.

Plaintiff was terminated.  Accordingly, Defendant's motion for summary is denied as to Plaintiff's discriminatory termination claims under Title VII and the ADEA.

### C.  Hostile Work Environment

With respect to Plaintiff's hostile work environment claims under the ADEA and Title VII, Defendant argues that there is insufficient evidence to support Plaintiff's theory that discriminatory conduct altered the terms and conditions of his employment. However, for the reasons set forth below, the Court concludes that Defendant has mischaracterized the amount of evidence in the record with respect to Plaintiff's hostile work environment claim under Title VII. Accordingly, Defendant's motion is granted as to Plaintiff's hostile work environment claim under the ADEA, but denied as to Plaintiff's hostile work environment claim under Title VII.

#### 1.  Applicable Law

There are essentially three elements to a hostile work environment claim under both Title VII and the ADEA.  First, the plaintiff must establish that the challenged conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004).  "This first element has both a subjective and an objective component.  The misconduct must be sufficiently severe or pervasive to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive." *Ford v. New York City Dep't of Health & Mental Hygiene*, 545 F. Supp. 2d 377, 392 (S.D.N.Y. 2008).

Although the Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required as a matter of law to state a claim, *see Richardson*, 180 F.3d at 439, "[i]solated instances of harassment ordinarily do not rise to this level." *Cruz*, 202 F.3d at 570. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening or humiliating, or a mere offensive utterance . . . ." *Howley*, 217 F.3d at 154 (quoting *Harris*, 510 U.S. at 23); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788, (1998) (holding that "simple teasing . . . offhand comments, isolated incidents (unless extremely serious)" are not discriminatory changes in the "terms and conditions of employment").

Second, the plaintiff must also establish a link between the offensive conduct and his membership in a protected class. *Ford*, 545 F. Supp. 2d at 393. "Abusive conduct in the workplace, if not based on a protected class, is not actionable under Title VII. The statute prohibits discrimination, and is not a civility code." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Third, there must be "'a specific basis . . . for imputing the conduct that created the hostile environment to the employer.'" *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996) (quoting *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995)).

## 2. Analysis

Plaintiff has not provided sufficient evidence to support a hostile work environment claim under the ADEA. *See Ford*, 545 F. Supp. 2d at 393 ("[O]n a motion for summary judgment, the nonmoving party 'must present concrete particulars and cannot succeed with purely conclusory allegations.'" (quoting *Cadle Co. v. Newhouse*, No. 01 Civ. 1777 (DC), 2002 WL 1888716, at *4 (S.D.N.Y. Aug. 16, 2002)). The Court finds evidence of only two age-related comments during the sixteen-month period of Plaintiff's employment.

Specifically, in "early 1998," Donohue told Plaintiff that "the future of the office lay with young White brokers." (Pl.'s Decl. ¶ 16), and on May 4, 1999, Donohue told that Plaintiff he "could not carry the briefcase . . . of any of the young guys and girls we have here." (Pl.'s Interrog. Resp. at 28.) Evidence of these two statements is merely indicative of "[i]solated instances of harassment," *Cruz*, 202 F.3d at 570, and is insufficient to sustain a hostile work environment claim.[11] Accordingly, Defendant's motion is granted as to Plaintiff's hostile work environment claim under the ADEA.

-------

[11]   As discussed above, the Court finds the evidence of Donohue's comments on May 4, 1999 to be probative of a potentially age-related motive for Plaintiff's termination. However, "a hostile work environment claim requires a different legal analysis from that applicable to an employment discrimination claim . . . ." *Rivera v. Potter*, No. 03 Civ. 1991 (LAP), 2005 WL 236490, at *1 n.2 (S.D.N.Y. Jan. 31, 2005). With respect to Plaintiff's hostile work environment claim under the ADEA, these two statements, taken together, are not indicative of a workplace "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.'" *Howley*, 217 F.3d at 153 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

However, with respect to Plaintiff's hostile work environment claim under Title VII, Defendant misstates both the quantity and the nature of the evidence in the record. Specifically, Defendant argues that Plaintiff has only alleged that he was subjected to eight instances of relevant comments or conduct, that three of them "objectively have nothing to do with race," and "one, by Plaintiff's own admission, did not offend him." (Def.'s Mem. at 19.) Defendant is not entitled to summary judgment based on this mischaracterization of the record.

"It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). Therefore, the Court agrees with Defendant that some of the evidence in the record is not relevant to the analysis of Plaintiff's hostile work environment claim. Specifically, the incident involving an exotic dancer and the comments by a co-worker who "viciously berated" Plaintiff are not evidence tending to support a hostile work environment claim.

Nevertheless, the Court has already discussed in detail several comments by Plaintiff's supervisors from which a reasonable juror could infer racial bias on the part of the speaker. *See supra* Part III.B.2. Plaintiff also alleges that one of those comments — the statement by Tabbah that Plaintiff was "wasting [his] time courting Black investors" and "should be devoting [his] efforts toward obtaining White accounts" — was made "on more than one occasion." (Pl.'s Decl. ¶ 19.)

Moreover, although the "stray remarks" doctrine may serve to limit the probative value of some comments in discrimination claims based on adverse treatment, "[c]omments by nondecisionmakers concerning a plaintiff may be admissible to demonstrate a pervasive hostile atmosphere . . . ." *Quinby*, 2007 WL 3047111, at *1 (citing *Malarky v. Texaco, Inc.*, 983 F.2d 1204, 1210 (2d Cir. 1993)). Therefore, the fact finder would be entitled to consider the evidence of Plaintiff's interaction with an employee named Healey, who "stated loudly" to Plaintiff "'Bookman, get your ass to the meeting.' . . . 'get your black ass to the meeting.'" (Pl.'s Interrog. Resp. at 33.)

In addition to race-related comments, actions by Defendant's employees are also relevant to the hostile work environment analysis under Title VII. Plaintiff contends that Tabbah and Donohue "encouraged the actions of many [employees] in the office," which "often would emerge in different ways that were both humiliating and embarrassing . . . ." (*Id.* at 20.) Relevant here is the evidence of segregated seating at the workplace and the January 1999 business meeting between Plaintiff and six African American investors. First, although Defendant disputes that it purposefully created a segregated seating arrangement, Plaintiff has sufficiently alleged that he notified his supervisor of his concerns regarding the seating, and that Donohue allegedly responded "'it's better than sitting at the back of the bus.'" (*Id.* at 29.) The parties' dispute regarding the probative value of this evidence cannot be resolved in a motion for summary judgment.

Second, with respect to the January 1999 business meeting, a reasonable juror could infer racial animus from the alleged behavior

20

of Defendant's employees toward a room in which only African Americans were present. Moreover, Plaintiff alleges that, when he reported the incident to his supervisor, Donohue merely asked, "well, what's the problem?" (*Id.* at 20.) Thus, Plaintiff's contentions regarding these events, including the fact that he notified his supervisors of both situations, are relevant to the analysis of his hostile work environment claim.

Therefore, based on the evidence of race-related comments and actions by Plaintiff's co-workers and supervisors, the Court cannot dismiss Plaintiff's Title VII hostile work environment claim as matter of law. Accordingly, Defendant's motion for summary judgment on this claim is denied.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted in part and denied in part. The following claims are hereby dismissed: (1) all of Plaintiff's claims under the ADA; (2) Plaintiff's claims under Title VII and the ADEA for failure to promote and retaliation; and (3) Plaintiff's hostile work environment claim under the ADEA. Plaintiff is also deemed to have abandoned any claims relating to his PDP training schedule and the circumstances surrounding his passage of the Series 7 exam. *See supra* note 5.

Remaining to be resolved in this litigation are: (1) Plaintiff's discriminatory termination claims under Title VII and the ADEA, and (2) Plaintiff's hostile work environment claim under Title VII.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

\* \* \*

Dated:   May 14, 2009
             New York, New York

For the purposes of opposing Defendant's motion for summary judgment, Plaintiff is represented by Michael Gerard O'Neill, 30 Vesey Street, New York, New York 10007. Defendant is represented by Debra S. Morway, Brennan Slater McDonough, and Christopher Alan Parlo, Morgan, Lewis and Bockius LLP, 101 Park Avenue, New York, New York 10178.

21